UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DANIEL J. DONOVAN,            )
                              )
    Plaintiff,            )
                              )
v.                            ) Civil No. 9-328-B-W
                              )
EVERETT FOWLE, et al.,        )
                              )
    Defendants            )

**RECOMMENDED DECISION**

In 1996, Daniel J. Donovan was convicted of gross sexual assault in the Kennebec County Superior Court. He served the imprisonment portion of his sentence but remains on probation and subject to a requirement that he register as a sex offender. Following his conviction, Donovan availed himself of the available means of proving his innocence through post-conviction DNA testing pursuant to a court ordered process. Donovan has now brought suit against the Kennebec County District Attorney and two of his assistants,[1] alleging violations of his constitutional rights in connection with this post-conviction DNA process. Pursuant to 42 U.S.C. § 1983, Donovan seeks declaratory and injunctive relief, and $30,000 in damages. Donovan claims that the three defendants prevented him from obtaining access to an evidentiary hearing in state court at which he could have presented DNA information that would have established his actual innocence. The defendants move for summary judgment on nine separate grounds, including that Donovan's suit is barred by the Rooker-Feldman doctrine and that their prosecutorial duties grant them immunity from suit. I now recommend that the court grant the defendants' motion for summary judgment.

---

[1]     Evert Fowle is the Kennebec County District Attorney. Alan Kelley is the Kennebec County Deputy District Attorney. Paul Rucha is a Kennebec County Assistant District Attorney.

## Material Facts

The following factual statement is drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56). The underlying statements are found in the Defendants' Statement of Material Fact in Support of Summary Judgment ("DSMF," Doc. No. 34), the Plaintiff's Response to Statement of Fact with Statement of Additional Facts ("RSF," Doc. No. 53), and the Defendants' Reply Statement ("DRS," Doc. No. 63).

## Donovan's Conviction for Gross Sexual Assault

During the night of June 22, 1994, Donovan, his girlfriend Robyn Reed, and two friends were celebrating Robyn's recent divorce at Donovan's house in Monmouth. State v. Donovan, 1997 ME 181, ¶ 2, 698 A.2d 1045, 1046. An incident ensued between Donovan and Reed, described in the Maine Supreme Judicial Court opinion referenced below, which forms the background for this lawsuit.[2] The police arrested Donovan and took the sweatpants he was

---

[2] At this point the defendants include additional facts from the Maine Supreme Court opinion that Donovan disputes. I do not find these facts material to the summary judgment issues, but I will set them forth for background purposes: At one point during the evening, Donovan became angry with Robyn and her friend, Melissa Lowe, and began threatening them. State v. Donovan, 1997 ME 181, ¶ 2, 698 A.2d at 1046. As Robyn and Melissa ran from the house, Donovan threw an ashtray at Robyn, striking her in the back. Id. As they were running away, Robyn and Melissa heard the sound of breaking glass. Id. Robyn and Melissa ran to a neighbor's house and asked him to call the police. Id. at 1046-47. After that, the two women returned to Donovan's house with the police to get Robyn's children, at which time they saw that Robyn's car had been damaged. Id. When Robyn returned to Donovan's house, he apologized and said everything would be all right, after which Robyn decided that she and her children would stay with him. Id. at 1045, 1047. After the police left, Donovan became angry and started hitting Robyn and pulling her hair. Id. Robyn told Donovan that she heard someone at the door, and while he went to see if anyone

wearing for evidentiary purposes. State v. Donovan, 2004 ME 81, ¶ 4, 853 A.2d 772, 774. Robyn was taken to the hospital where the underwear and the blanket she was wrapped in were taken to preserve any evidence on them. Id. Robyn did not consent to a physical examination during her initial visit to the hospital, but upon her return hours later she was examined and evidence from the examination was preserved. Id. Police also took as evidence a used condom found in Donovan's kitchen trash on the evening of June 22, 1994. Id.

   Deputy District Attorney Alan Kelley prosecuted the State's case against Donovan. (Compl. ¶ 11.) At trial, Donovan argued that he did not have sexual intercourse with Robyn during the morning of June 22, 1994. State v. Donovan, 2004 ME 81, ¶ 5, 853 A.2d at 774. Allison Gingrass, a forensic chemist with the Maine State Police Crime Laboratory who analyzed several items of physical evidence, testified about possible identification of the individual who deposited semen found on Robyn's external genitalia during her second hospital visit and in the condom found in Donovan's kitchen trash can. Id. Gingrass concluded that at least some part of the mix of blood and semen on a swab containing fluid taken from Robyn's external genitalia belonged to an individual in *her* blood group. Id. Gingrass also testified that in a mixture of fluids a more prevalent fluid could mask others, making it difficult to determine if a different blood group was present. Id. Donovan was of a different blood group than Robyn, and no evidence of his blood group was identifiable on the swab. Id. Gingrass further testified that the semen in the condom found by the police in Donovan's kitchen trash can came from someone with Donovan's blood group, and that a pubic hair found in the condom was similar to

---

was there, she dialed 911. Id. When Donovan returned and saw the phone off the hook, Robyn ran down the hallway to get away from him. Id. Donovan caught Robyn, kicked her, and pulled off her pants. Id. After ripping off her underwear, Donovan put on a condom and began having sexual intercourse with Robyn. Id. Robyn then heard the police at the door and screamed for them to come inside the house. Id. After the police entered the house, Robyn told them that Donovan had raped her. State v. Donovan, 2004 ME 81, ¶ 3, 853 A.2d 772, 773.

a sample taken from Donovan and dissimilar to a sample taken from Robyn. Id. Finally, Gingrass testified that when the condom was used could not be determined. Id. Donovan disputes much of Gingrass's testimony. (RSF ¶ 35-36.)

In its closing argument at Donovan's criminal trial, the State referred to Gingrass's analysis, reiterating that Donovan's blood group was consistent with that of the semen in the condom, and argued that Donovan attempted to conceal the condom by throwing it in the trash. State v. Donovan, 2004 ME 81, ¶ 8, 853 A.2d at 774. The jury found Donovan guilty of gross sexual assault, assault, criminal mischief, and the violation of a bail condition. State v. Donovan, 1997 ME 181, ¶ 1, 698 A.2d at 1046. He was sentenced to twenty years, with all but fifteen years suspended, followed by six years probation on the gross sexual assault charge. State v. Donovan, No. CR-94-393, 2002 Me. Super. LEXIS 242 * 1, 2002 WL 32068362 (Me. Super. Ct., Ken. Cty., Nov. 20, 2002). Donovan subsequently appealed his convictions to the Maine Supreme Judicial Court on various grounds unrelated to the DNA issues at hand. State v. Donovan, 1997 ME 181, ¶ 2, 698 A.2d at 1045-1046. The Maine Supreme Court affirmed Donovan's criminal convictions in all respects. Id. Donovan also filed a motion to preserve evidence that the Superior Court granted. State v. Donovan, 2004 ME 81, ¶ 8, 853 A.2d at 774.

### Post Trial Motions

In 2002, Donovan filed a post-conviction motion for DNA analysis in which he sought to have several pieces of evidence analyzed. Id. In addition to again denying that he had sexual intercourse with Robyn on the morning of June 22, 1994, Donovan argued that Robyn had consensual sexual intercourse with another man between her first and second visits to the hospital on June 22, 1994, and that the other man was responsible for the semen found on the swab. Id. The Superior Court denied Donovan's motion and granted the State's motion to

dismiss pursuant to Maine's newest post-conviction DNA analysis statute, 15 M.R.S. §§ 2136-2138 (2003). Id. The Superior Court concluded that Donovan had presented *prima facie* proof that the evidence he sought to have analyzed was, pursuant to Section 2138(4)(A), material to his identity as the perpetrator of the gross sexual assault against Robyn. Id. However, the Superior Court further concluded that Donovan failed to present *prima facie* proof that, pursuant to Section 2138(4)(E), identity was at issue during Donovan's criminal trial. Id. at 772, 774-75. On appeal, the Maine Supreme Judicial Court noted that it was interpreting the meaning of 15 M.R.S. §§ 2136-2138 for the first time. Id. at 772, 775. For purposes of meeting the requirements set forth in the post-conviction DNA statute, the Supreme Court concluded that identity was always at issue in a criminal trial unless the defendant admitted to having engaged in the alleged criminal conduct and relied on a defense such as consent or justification. Id. at 772, 776. Consequently, the Supreme Court vacated the Kennebec Superior Court's Order and remanded Donovan's case for further proceedings consistent with its Opinion. Id.

### The DNA Evidence

On or about January 24, 2005, Stephen Shargo examined the vaginal swab taken from Robyn Reed that Allison Gingrass testified about at Donovan's criminal trial. (DSMF ¶ 52.) Gingrass had found *both* blood and semen on the swab, but Shargo found no semen on the remains of the swab. (Id. ¶ 53.) Shargo explained that he did not find semen on the remains of the swab because the sample that Gingrass tested was no longer available. (Id. ¶ 54.) Shargo explained that it was "not unusual to test different portions of a gauze pad and obtain different results," and that "the [original] examiner usually chooses 'the best' source to cut for the analysis." (Id. ¶ 55 (citing Shargo Aff. ¶ 3).) Donovan filed a motion for post-conviction review predicated on the results of Shargo's DNA testing of the swab, arguing that it was "newly

discovered evidence that testimony at his trial was false or erroneous." (Id. ¶ 56.) Defendant Paul Rucha, in his capacity as Kennebec County Assistant District Attorney, filed the State's motion to dismiss the petition for post conviction review. (Compl. ¶ 32.) Justice Mills rejected Donovan's argument, noting that Allison Gingrass was unable to determine whether the semen and blood on the swab were Donovan's. (DSMF ¶ 57.) Citing 15 M.R.S. § 2125, Justice Mills concluded that the record evidence in Donovan's case failed to show, under any standard, that his criminal conviction was unlawful. (Id. ¶ 58.) Mills also concluded that the record evidence "would not have resulted in a different verdict" and so denied Donovan's petition for post-conviction relief. (Id. ¶ 59.)

Thereafter, Donovan filed a second motion for DNA testing. (Id. ¶ 60.) Justice Mills denied it on the ground that "no sufficient basis ha[d] been provided to justify a second testing." (Id.) Donovan unsuccessfully moved for reconsideration of Mills' Order and, assisted by counsel, argued that the Kennebec County Superior Court erred when it denied Donovan's request for a new trial pursuant to 15 M.R.S. §§ 2136-2138. (Id. ¶ 61-62.) Donovan asserted that he was entitled to a hearing under 15 M.R.S. § 2138(8)(B), which provides:

> If the results of the DNA analysis show that the person is not the source of the evidence and the person does not have counsel, the court shall appoint counsel if the court finds the person is indigent. *The court shall then hold a hearing pursuant to subsection 10.*

(Id. ¶ 63 (emphasis added).) Donovan reasoned that pursuant to 15 M.R.S. § 2138(8)(B) "a person shown not to be the source of the DNA evidence . . . is entitled to a hearing on whether or not he or she is entitled to a new trial." (Id. ¶ 64.) In support of his request for a hearing under Section 2138(8)(B), Donovan contended that "the complete lack of any DNA on the gauze pad does establish that he was not the source of the evidence that was used against him at trial and that this meets the definition and purpose of the statute." (Id. ¶ 65.) Donovan's Memorandum

6

acknowledged that "questions persist with regard to whether Petitioner meets the requirements of [Section 2138](8)(B) as to whether the DNA results in this case 'show that he is not the source of the evidence.'" (Id. ¶ 66.) The Maine Supreme Court ruled that Donovan's contention that the Superior Court erred or exceeded its discretion by failing to grant him an evidentiary hearing was "without merit." (Id. ¶ 67.) Accordingly, it held that "no further hearing or other action [was] necessary to a fair disposition of the matter." (Id. ¶ 68.)

## Discussion

Plaintiff Donovan alleges that the three defendants, Alan Kelley, Paul Rucha, and Evert Fowle, deprived him of his constitutional rights in violation of 42 U.S.C. § 1983. (Compl. at 1.) Defendants move for summary judgment on several grounds, including that Donovan's claims are barred by the Rooker-Feldman doctrine, and that their prosecutorial duties grant them immunity. (Mot. for Summ. J. at 13.) I will address these two issues in turn.

**A. Summary Judgment Standard**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008). If such facts and

inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

**B. Rooker-Feldman**

Defendants move for summary judgment on the ground that the Rooker-Feldman doctrine bars Donovan's Section 1983 claims. (Mot. for Summ. J. at 7-10.) The doctrine, which holds that lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments, prevents plaintiffs in federal court from collaterally attacking state court decisions. District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 486-87 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16 (1923). Because only the United States Supreme Court may hear direct appeals from state court decisions, federal district courts must decline jurisdiction when presented with "state-court losers complaining of injuries caused by state-court judgments . . . and inviting district court review and rejection of those judgments." Lance v. Dennis, 546 U.S. 459, 464 (2006) (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005)). Historically, the lower federal courts incorporated that bar as extending to those claims "inextricably intertwined" with the claims adjudicated in the state court action. Sheehan v. Marr, 207 F.3d 35, 40 (1st Cir. 2000). A federal claim is inextricably intertwined with the state court claims "if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." Id.

In Exxon Mobil the Supreme Court significantly narrowed the lower courts' application of Rooker-Feldman, limiting the doctrine to the kinds of cases from which it derived. 544 U.S. at 284; Davison v. Gov't of P.R.—P.R. Firefighters Corps, 471 F.3d 220, 222 (1st Cir. 2006). The Court warned that lower courts have at times extended the doctrine "far beyond the contours

of the Rooker and Feldman cases, overriding Congress' conferral of federal court jurisdiction concurrent with jurisdiction exercised by state courts . . . ." Exxon Mobil, 544 U.S. at 283. In the wake of Exxon Mobil, lower courts may only rely on Rooker-Feldman to dismiss a case if the federal plaintiff seeks to redress an injury *caused by* an allegedly erroneous state court judgment and invites the district court to review and reject that judgment. Id. at 284; Davison, 471 F.3d at 222. If the federal plaintiff alleges a constitutional violation independent of the injury caused by the state court judgment, the doctrine does not bar jurisdiction. Exxon Mobil, 544 U.S. at 284; Todd v. Weltman, Weinberg & Reis Co., 434 F.3d 432, 437 (6th Cir. 2006) (reiterating that Rooker-Feldman does not apply when the plaintiff complains of a wrong independent of injuries caused by a related state court judgment); Washington v. Wilmore, 407 F.3d 274, 280 (4th Cir. 2005) (holding that Rooker-Feldman does not apply when the plaintiff's "injury rests not on the state court judgment itself but rather on the alleged violation of his constitutional rights by [the defendant]").

Rooker-Feldman thus precludes jurisdiction only if 1) Donovan's case is brought by a state court loser; 2) the state court judgment was rendered before the district court proceedings commenced; 3) the alleged injury was caused by the state court judgment; and 4) the federal case invites district court review and rejection of the state court judgment. Exxon, 544 U.S. at 284. I find that the first two criteria are met, but am not convinced that the injuries alleged were caused by the state court judgment itself, or that every possible characterization of the present federal claim necessarily invites review and rejection of the state court judgment.

Donovan alleges violations of his constitutional rights in three forms, namely the defendants' alleged refusal to "allow" him an evidentiary hearing to prove his innocence based

9

on DNA test results,[3] their attempts to conceal exculpatory evidence, and their reliance on "false" testimony by Forensic Chemist Allison Gingrass. (Compl. at 1.) Donovan asserts that he suffered a variety of injuries to his constitutionally protected civil rights as a result of this "pattern of violations." (Id. at 8-14.)

Donovan complains that the defendants' actions deprived him of his civil rights, prevented him from proving his innocence, and resulted in his registration as a sex offender. (Compl. ¶¶ 45-72.) The First Circuit has held that a federal claim is inextricably intertwined with a state judgment "if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." Sheehan, 207 F.3d at 40. A reading of Donovan's complaint suggests that it is inextricably intertwined with the merits of his post-trial motion for DNA analysis, which is itself a challenge to the merits of his conviction.

However, the "inextricably intertwined" approach to Rooker-Feldman predates the Supreme Court's significant narrowing of the doctrine in Exxon Mobil.[4] 544 U.S. at 284. In Exxon Mobil, the Court noted that in the years since Feldman it had never applied the doctrine to dismiss an action for want of jurisdiction and held that if the federal plaintiff alleges a constitutional violation independent of the injury caused by the state court judgment, the doctrine does not bar jurisdiction. Id. at 284, 287.

Viewing Rooker-Feldman through this considerably narrowed perspective, Donovan's alleged injuries exist independent of the state court judgment. The Fourth Circuit held that

---

[3] Donovan complains of the defendants' "continued refusal to allow him an evidentiary hearing or the chance to exercise his right to demonstrate his actual innocence based on his Forensic and DNA test results . . . ." (Compl. at 1.) Obviously, the defendants in their roles as prosecutors had no power to grant or allow Donovan a hearing—that was the responsibility of Justice Mills. Donovan likely means to complain of the defendants' advocacy against his efforts to secure a hearing.

[4] Exxon Mobil did not explicitly void the "inextricably intertwined" language, but given the strict standard it set forth for applying Rooker-Feldman, commentators have inquired into the continued viability of "inextricably intertwined." See Allison B. Jones, note, *The* Rooker-Feldman *Doctrine: What Does It Mean To Be Inextricably Intertwined?*, 56 DUKE L.J. 643 (2006).

Rooker-Feldman does not apply where the plaintiff "challenge[d] not his conviction but rather one aspect of the means by which that conviction was achieved."[5] Washington v. Wilmore, 407 F.3d at 280. As in Washington, Donovan's "claim of injury rests not on the state court judgment itself, but rather on the alleged violation of his constitutional rights by [the defendants]." Id. Donovan alleges that the defendants' actions (denying him a hearing, relying on "false" testimony, and concealing evidence), not the state court judgment, violated his civil rights. (Compl. at 1, 8-12.)

Donovan has not brought suit in an effort to directly review or reverse the state court judgment against him. (Compl. at 1.) He seeks damages in connection with alleged prosecutorial misconduct and violations of his civil rights, including concealment of exculpatory evidence and reliance on "false" testimony. The Civil Rights Act affords subject matter jurisdiction over Donovan's claims and the Rooker-Feldman doctrine does not clearly bar exercise of that jurisdiction. Therefore, I conclude that this court has subject matter jurisdiction and should decide this case on the merits.

## C. Prosecutorial Immunity

Donovan alleges civil rights violations pursuant to 42 U.S.C. § 1983, which provides that "[e]very person" who acts under color of state law to deprive another of a constitutional right shall be answerable to that person in a suit for damages. (Compl. at 1.) While on its face the statute appears to create no immunities to liability, a literal reading of the statute has never prevailed. Imbler v. Pachtman, 424 U.S. 409, 417 (1976). In Imbler, the Court held that the common-law immunity of a prosecutor is "based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties,"

---

[5] The court in Washington looked in particular to Jordahl v. Democratic Party of Va., which distinguished between actions "seeking review of the state court decisions themselves and those cases challenging the constitutionality of the process by which the state court decisions result." 122 F.3d 192, 202 (4th Cir. 1997). 407

11

including concerns that harassment by unfounded litigation would distract the prosecutor from his public duties and "shade his decisions." Id. at 422-23. In the absence of *absolute* immunity for prosecutorial conduct, the Court reasoned, "apprehension" of possible civil suits would "weaken the fearless and impartial policy which should characterize the administration of this office." Id. at 423 (quoting Pearson v. Reed, 6 Cal. App. 2d. 277, 287 (1935)). Thus, permitting civil claims would impose "unique and intolerable burdens" upon the prosecutor personally and the criminal justice system generally. Id. at 425. While the Court acknowledged that such a blanket rule adopting absolute prosecutorial immunity would "leave the genuinely wronged defendant without civil redress," it reasoned nonetheless that the "broader public interest" was best served by the "vigorous and fearless" performance of the prosecutor's duty, and furthermore that criminal sanctions and professional discipline still serve as "checks" upon the prosecutor's power. Id. at 427, 429.

Not all prosecutorial conduct warrants absolute immunity. Absolute immunity only applies to prosecutorial actions that are "intimately associated with the judicial phase of the criminal process." Van de Kamp v. Goldstein, 129 S. Ct. 855, 860 (2009) (quoting Imbler, 424 U.S. at 430). In determining which prosecutorial activities merit immunity, the reviewing court looks to "the nature of the function performed, not the identity of the actor who performed it." Forrester v. White, 484 U.S. 219, 229 (1988). According to this "functional test," a prosecutor receives absolute immunity only when performing his function as an "advocate," "act[ing] within the scope of his duties in initiating and pursuing a criminal prosecution." Imbler, 424 U.S. at 410. By comparison, he receives only partial immunity when acting "in the role of an administrator or investigative officer." Id. at 430-32. In the years since Imbler, the Supreme Court has held that absolute immunity applies when a prosecutor files criminal charges, id. at

12

409, prepares to initiate a judicial proceeding, Burns v. Reed, 500 U.S. 478, 492 (1991), advocates at a preliminary hearing, id. at 478, or appears in court to present evidence in support of a search warrant application, Kalina v. Fletcher, 522 U.S. 118, 126 (1997), but not when a prosecutor gives advice to police during a criminal investigation, Burns, 500 U.S. at 496, makes statements to the press, Buckley v. Fitzsimmons, 509 U.S. 259, 277 (1993), or acts as a complaining witness in support of a warrant application, Kalina, 522 U.S. at 132.

Thus, to be entitled to summary judgment the defendants must show that there is no genuine issue of material fact that the alleged Section 1983 violations occurred while they were acting as "advocates" and "officers of the court," and performing prosecutorial duties "intimately associated with the judicial phase of the criminal process." Van de Kamp, 129 S. Ct. at 861 (quoting Imbler, 424 U.S. at 430-31). In particular, Donovan alleges three violations of his constitutional rights. In each case, I find that the duties in question were performed pursuant to the prosecutors' roles as "advocates."

First, Donovan alleges the defendants' "continued refusal to allow him an evidentiary hearing or the chance to exercise his right to demonstrate his actual innocence based on his Forensic and DNA test results." (Compl. at 1.) Even if true, under the "functional test" the defendants' "refusal" to allow Donovan an evidentiary hearing occurred pursuant to their duties as "advocates," as it was part of "initiating a prosecution [or] in presenting a State's case." Imbler, 424 U.S. at 410, 430. There is no evidence that these actions by the defendants occurred in the context of "administrat[ive]" or "investigative" prosecutorial activities. Rather, arguing in opposition to a request for an evidentiary hearing fits the definition of "advocacy" neatly, as it necessarily involves arguing the State's case before the court.

The same can be said for Donovan's second allegation, that defendants "attempted to delay and/or conceal highly exculpatory evidence." (Compl. at 1.) Courts have spoken specifically to this issue, holding that absolute prosecutorial immunity encompasses bad faith withholding of evidence. Campbell v. Maine, 787 F.2d 776, 777 (1st Cir. 1986) ("Imbler rejected a suggestion that the prosecutor's immunity be reduced to a qualified one when he is alleged to have withheld exculpatory information.").

Donovan's third allegation is "the ongoing facilitation of, and reliance on false testimony by former Forensic Chemist Allison Gingrass." (Compl. at 1.) Again, even assuming this allegation is true, any reliance on Gingrass's testimony was well within the borders of what could be considered the "advocate" functions of a prosecutor, as this reliance was for the express purpose of "presenting [the] State's case" at trial. Imbler, 424 U.S. at 430.

Finally, Donovan disputes the defendants' defense of prosecutorial immunity by asserting that "[d]efendants cannot claim their actions were within the scope of their official duty," and providing a list of their alleged misdeeds, including concealing evidence and misleading the court. (Opp'n. to Mot. for Summ. J. at 17.) Donovan appears to be asserting, in essence, that immunity does not apply because proper prosecutorial conduct would preclude such civil rights violations. It is certainly true that the defendants' official duties do not include depriving individuals of their constitutional rights. But even assuming that the alleged misdeeds did occur, it would not necessarily mean that the defendants were not acting as "officers of the court" when they allegedly violated Donovan's rights. Imbler, 424 U.S. at 430. Donovan must show that at the time of the alleged violations the defendants were performing duties unrelated to the "judicial phase of the criminal process," such as administrative or investigative tasks, and he simply does not provide facts which show that the violations occurred at a time *other than*

when the defendants were "initiating a prosecution or presenting a state's case." Id.; Campbell, 787 F.2d at 777. On the contrary, the allegations all concern conduct occurring while the defendants were performing their duties as prosecutors and officers of the court. Imbler, 424 U.S. at 430.

Donovan states that his suit is brought against the defendants in their individual capacity, seemingly suggesting that an action brought against them as individuals somehow escapes the shield of prosecutorial immunity. However "a § 1983 action brought . . . for damages against prosecutors in their individual capacity would . . . be barred by the doctrine of prosecutorial immunity." Willhauck v. Halpin, 953 F.2d 689, 711 (1st Cir. 1991). Donovan must present facts showing that the defendants' actions were performed in other than their quasi-judicial capacity, Van de Kemp, 129 S. Ct. at 861. He fails to do so and judgment should accordingly enter for the defendants.

**CONCLUSION**

Based on the foregoing, I recommend that the defendants' motion for summary judgment be GRANTED with respect to their defense of prosecutorial immunity.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Date August 9, 2010